**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William W. HOLLAND,**
**Defendant-Appellant.**

**No. 76–3763.**

United States Court of Appeals,
Fifth Circuit.

May 23, 1977.

---

Sterling G. Culpepper, Jr. (Court-appointed), Charles S. Coody, Montgomery, Ala., for defendant-appellant.

Ira DeMent, U. S. Atty., Milton L. Moss, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GOLDBERG and TJOFLAT, Circuit Judges, and WYATT *, District Judge.

WYATT, District Judge:

William W. Holland appeals from a judgment of conviction of criminal contempt, such judgment having been entered by the United States District Court for the Middle District of Alabama (Honorable Frank M. Johnson, Jr., District Judge) on September 27, 1976. The contempt for which Holland was convicted was disobedience of an order of the District Court made and filed, under circumstances to be related, on July 1, 1976.

We find that there was no authority to make the July 1, 1976 order. The judgment of conviction of criminal contempt for disobedience of that unauthorized order must therefore be reversed.

1.

At all relevant times Holland was an inmate of Holman Prison, an institution of the State of Alabama located at Atmore, Alabama.

In early 1976, postal inspectors had reason to believe that a scheme was in operation in the Alabama prison system for altering postal money orders, raising them in amount and then cashing them for the raised amounts. The scheme was thought to involve a number of inmates and also others, both inside and outside the prison system.

Based on an affidavit of a postal inspector, the United States Attorney for the Middle District of Alabama in April and May, 1976, obtained orders of the District Court authorizing representatives of the Postal Service to open and inspect mail of several named inmates. Appellant Holland was not one of those named nor was he referred to in the postal inspector's affidavit. The caption on the papers, apparently placed there by the United States Attorney's office, was "*United States of America v. Jerry Neal Baker, et al*" and the file number was given as "Cr.Misc.No.77". Jerry Neal Baker was the first of the inmates listed in the motion for the orders. Appellant Holland was not one of the "et al" because, as noted above, he was not referred to in the papers.

On June 30, 1976, the United States Attorney filed a "motion to compel handwriting exemplars". This was based on an affidavit of Mr. Martin, a postal inspector, sworn to June 1, 1976. The affidavit recited that Holland and six other Holman Prison inmates "are suspected of writing false information on altered Postal money orders". There followed as to each named inmate a statement of the information which caused suspicion to attach to him. As to appellant Holland, this was the statement:

"U.S. Postal money order # 2,022,816,-750–6 was issued at Atmore, AL on 3–15–76 in the amount of $1.00. This money

* Senior District Judge of the Southern District of New York, sitting by designation.

order was altered and raised to $200.00. Holman Prison Guard William C. Freeman has admitted he gave this money order to his wife and that she cashed it on 3–17–76 at Piggley Wiggley Store, Atmore, AL. Mr. Freeman stated the money order was given to him by William W. Holland on 3–16–76.

"On 4–27–76 William W. Holland refused to furnish handwriting."

The affidavit of the postal inspector was made for the purpose of obtaining from the District Court a writ of habeas corpus ad testificandum so that the named inmates could be produced as witnesses before a grand jury. His affidavit declared: "Writs are needed to require these individuals to appear before a Federal Grand Jury to furnish handwriting exemplars". The habeas corpus statute contemplates the production of prisoners, state or federal, "to testify". 28 U.S.C. § 2241(c)(5); see *Ex parte Dorr*, 44 U.S. (3 How.) 103, 105, 11 L.Ed. 514 (1845).

For some reason not explained, however, the United States Attorney did not present the matter to a grand jury nor did he ask for a writ of habeas corpus ad testificandum to bring Holland and the others as witnesses before a grand jury. Instead, the United States Attorney submitted to the District Court the "motion to compel handwriting exemplars". This motion was given the same file number ("Cr.Misc.No.77") and the same caption as the earlier mail inspection motions and orders: *"United States of America v. Jerry Neal Baker, et al"*. Jerry Neal Baker was not one of those sought to be compelled to give handwriting exemplars. Holland and four others sought to be compelled by the motion to give handwriting exemplars had not been named in the earlier papers.

On July 1, 1976, the day following the submission of the motion, the District Court made and filed an order that Holland and the other six inmates "provide to agents of the United States Postal Inspection Service samples and exemplars of their handwriting". The Marshal's return shows that a copy of the order was served personally on Holland on July 7, 1976.

On July 13, 1976, a postal inspector and state prison officials interviewed Holland, who refused to obey the court order and, according to a memo of the postal inspector, asked for "a court appointed attorney to advise him on the legality of the court order".

On August 19, 1976, the United States Attorney filed a "motion for order to show cause". On the same day, the District Court made and filed an order requiring Holland and four others to show cause "in writing" why they should not be held in contempt of court. On the same day, the District Court appointed Sterling G. Culpepper, Jr., Esq., a member of the Alabama Bar, as counsel to Holland.

On September 1, 1976, counsel for Holland filed a "response" stating that he had refused and would refuse to give handwriting exemplars "for the reason that he has not been charged with any offense connected with forgery or falsification of written documents".

Later on the same day the District Court issued and filed a "citation for criminal contempt of court". This directed Holland to appear before the Court on September 27, 1976, "for a hearing on the merits of this criminal contempt citation". The citation confirmed the appointment of Mr. Culpepper to represent Holland.

The hearing on the citation of Holland for criminal contempt was duly held on September 27, 1976. Holland was present in Court and was represented by counsel. The evidence for the government established that Holland had refused to obey the July 1, 1976 order that he give handwriting exemplars. Holland offered no evidence. There was no argument. The Court announced its finding that Holland was guilty of criminal contempt of the Court.

Holland then told the Court that he (Holland) was being used "as a lever to get the other people"; that he (Holland) had not been charged with any crime; that there was no evidence to show that he was impli-

cated in the scheme; and that he felt that he should not be "used in this way".

The Court next imposed a sentence of imprisonment for six months, the sentence to be consecutive to any sentence earlier imposed on Holland.

This appeal followed.

### 2.

◼ The taking of handwriting exemplars does not violate any Fifth Amendment constitutional privilege against self-incrimination nor any Sixth Amendment right to the assistance of counsel. *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). See also *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). These last two decisions also establish that it does not violate the Fourth Amendment protection from unreasonable searches and seizures.

So much is undisputed. There is no defect in the order below because it compels the furnishing of handwriting samples.

### 3.

The argument for appellant is that the District Court had no jurisdiction to make the July 1, 1976 order; that the order was made without authority; and that thus, not being a "lawful . . . order", the District Court had no power to punish for contempt (18 U.S.C. § 401(3)). We find this argument persuasive.

### 4.

◼ It is elementary that, whereas most state trial courts have a general jurisdiction, all federal courts (other than the Supreme Court), trial or otherwise, have a *limited* jurisdiction. Congress was given authority in the Constitution (Article III, Section 1) to "ordain and establish" inferior courts. Congress thus has power to fix precisely the jurisdiction of those courts. The presumption is that a federal court lacks subject matter jurisdiction until it is shown to exist. *Edwards v. Selective Ser-*

*vice etc.*, 432 F.2d 287, 290 (5th Cir. 1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1637, 29 L.Ed.2d 122 (1971).

### 5.

There are a number of instances in which orders have been made by District Courts that handwriting examples be furnished or similar non-testimonial identification be made (appearance in line-ups, voice exemplars). In all those instances to which our attention has been called by counsel, or which our researches have discovered, the jurisdiction of the District Court over the proceeding, or over the person affected, was clearly made to appear. There was either an arrest of the person, or an indictment, or a grand jury investigation for which testimonial compulsion by the Court was required. There was something before the court, a proceeding or a person or both, over which the Court had jurisdiction.

Examples of orders for non-testimonial identification in aid of a grand jury investigation are *United States v. Dionisio*, above cited, (voice exemplars), and *United States v. Mara*, above cited, (handwriting exemplars). Another example is in the Second Circuit, *United States v. Doe*, 405 F.2d 436 (Friendly, C. J.; 2 Cir. 1968) where a contempt conviction was affirmed after a grand jury witness had disobeyed orders of the foreman and of the District Judge to give handwriting exemplars to the grand jury.

◼ In the grand jury cases, the authority of the Court is clear. The grand jury is, on history and on principle, an "appendage of the court" (*Brown v. United States*, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959)), "an agency of the court" which "exercises its powers under the authority and supervision of the court" (*United States v. Stevens*, 510 F.2d 1101, 1106 (5th Cir. 1975)). If a grand jury is investigating a matter, this is an investigation by an agency of the court and under the court's supervision. Congress, since the time of the Judiciary Act of 1789, has authorized the District Courts to issue orders for the testimony of witnesses before federal courts. 1 Stat. 73,

88–89, *Kastigar v. United States*, 406 U.S. 441, 444–445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) The same authority is now found in Fed.R.Crim.P. 17(a). This authority has always been interpreted to include the compelling of testimony before *grand juries*, as well as before the Court itself. *United States v. Calandra*, 414 U.S. 338, 346 fn. 4, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)

In other cases, orders were made for nontestimonial identification after an indictment had been returned, a proceeding over which the District Court clearly had jurisdiction.

In *United States v. McNeal*, 463 F.2d 1180 (5th Cir. 1972) a District Court had ordered McNeal, then in state custody, to give handwriting examples and he had complied. The power of the Court to make such an order was not raised as an issue. It appears that there were "federal charges" pending against McNeal at the time and the District Court had jurisdiction over such charges (presumably an indictment). This Court said (463 F.2d at 1181; emphasis supplied):

"Here, McNeal was lawfully detained in State custody *with federal charges against him* and he was under Court order to give the handwriting exemplars".

A leading case in this Circuit involved an order made during the trial of an indictment before a District Court. *United States v. Nix*, 465 F.2d 90 (5th Cir.), cert. denied, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972)

The Sixth Circuit has sustained a trial court order to a defendant to give handwriting examples where the defendant had earlier been indicted. *United States v. Ruggirello*, 454 F.2d 725 (6th Cir. 1972)

There are other cases in which the jurisdiction of the District Court to make an order is based on jurisdiction over the person of the defendant resulting from a lawful arrest and the then pendency of a proceeding (arrest, presentment to a magistrate, complaint) over which the Court also had jurisdiction.

The significance of a lawful arrest to establish a proper basis for compelling handwriting exemplars is shown in *Bradford v. United States*, 413 F.2d 467 (5th Cir. 1969), a case in which the exemplars were taken by postal inspectors without a court order. This Court said (at 472):

"We hold that the taking of the handwriting exemplars from Bradford is similar to blood sampling and fingerprinting and that if Bradford was under arrest at the time given they were admissible.

"If on the other hand he was not under arrest or the exemplars were not given voluntarily, it was error to admit them."

In *Lewis v. United States*, 127 U.S.App. D.C. 269, 382 F.2d 817, cert. denied, 389 U.S. 962, 88 S.Ct. 350, 19 L.Ed.2d 377 (1967), there was an arrest and the taking of handwriting exemplars before presentment of defendant to a magistrate. This was held to violate no constitutional rights. The Court, through then Circuit Judge Burger, said (382 F.2d at 819; emphasis supplied):

"Routine procedures, such as taking photographs, fingerprints, or handwriting exemplars of *lawfully arrested* suspects, invade no conceivable right that the *Mallory* [*Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479] rule was designed to protect.

" . . . Appellant's writing could have been compelled on pain of contempt at any stage *after he was before the Court.*"

The point of significance is the acquisition of jurisdiction over the person by virtue of the lawful arrest.

In *Adams v. United States*, 130 U.S.App. D.C. 203, 399 F.2d 574 (1968), cert. denied under the name of *Roots v. United States*, 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969), the Court of Appeals for the District of Columbia dealt with the admissibility of identification evidence at a compelled lineup against persons who had been arrested but had not been timely presented to a magistrate as required by Fed.R.Crim.P. 5(a). In the course of its opinion, the Court had this to say (399 F.2d at 578–79; emphasis supplied):

"But, had the police heeded Rule 5(a) and taken appellants after booking before a magistrate, it is by no means certain that the police could not legally have arranged for other victims to view appellants in line-ups. Such line-ups would have to meet due process standards, and to include the opportunity to have counsel present. *Once brought under judicial authority by virtue of the presentment to a magistrate* commanded by Rule 5(a), *the police could invoke the aid of that authority* to make the prisoner reasonably available for line-up identification in respect of other crimes for which there is less than probable cause to arrest."

The Court was thus suggesting that where a person has been arrested and presented to a magistrate, the District Court has jurisdiction over such person and may make orders for line-up appearances; orders for handwriting exemplars would seem to stand on the same footing.

The suggestion in *Adams* was adopted in the District of Columbia, where District Judges and magistrates were asked to sign, and did sign, orders that arrested persons appear in line-ups for identification, including line-ups as to crimes other than those for which they were arrested. See, for example, *United States v. Allen*, 133 U.S. App.D.C. 84, 408 F.2d 1287 (1969); *Spriggs v. Wilson*, 151 U.S.App.D.C. 328, 467 F.2d 382, 383 (1972).

Similarly the Ninth Circuit has affirmed the conviction of a defendant for contempt in refusing to ǫbey an order to give handprinted exemplars. Jurisdiction to make the order was abundantly shown because defendant had been arrested, a complaint had been filed, and a preliminary hearing had been commenced. *United States v. Rudy*, 429 F.2d 993 (9th Cir. 1970).

### 6.

On October 7, 1969, a bill (S. 2997) was introduced in the Senate by Senator McClellan. This bill would have authorized an application to a United States District Judge by an investigative officer of any agency of the United States. If the application made the prescribed showing, the District Judge was authorized to issue a subpoena requiring the person named to appear before a magistrate for the obtaining of evidence of identifying physical characteristics, including handwriting. 115 Cong.Rec. 28900. Senator McClellan described the bill as a "new and novel approach" and explained that he wanted it given "close scrutiny and study", that he was "not necessarily committed to the bill", that it was based on dicta in the Supreme Court's opinion in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and that this dicta had suggested that detention to secure identifying evidence might be constitutionally permissible "even though there is no probable cause in the traditional sense". 115 Cong.Rec. 28896, 28897.

Senator McClellan's bill was referred to the Committee on the Judiciary and was never heard of again, apparently dying in Committee.

### 7.

Under date of March 31, 1971, the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States submitted to the Bench and Bar for comments and suggestions a draft of proposed amendments to the Federal Rules of Criminal Procedure and of some "additional rules" of Criminal Procedure. These had been prepared by the Advisory Committee on Criminal Rules.

Among the new rules, the "additional rules", was "Rule 41.1 Nontestimonial identification". This new rule would have authorized a magistrate to issue a "nontestimonial identification order" on request of a federal law enforcement officer or an attorney for the government and on a prescribed showing by affidavit. The radical change proposed by the new rule was to authorize such an order *before* arrest and on evidence less than that required to make an arrest.

The Judicial Conference, at its meeting on October 26–27, 1972, approved for transmittal to the Supreme Court certain amend-

ments to the Criminal Rules and certain new Rules but the Conference specifically did not approve the proposed Rule 41.1. The "Report of the Proceedings of the Judicial Conference of the United States" has this to say on the subject (pp. 46–47; emphasis supplied):

> "The Conference was advised that the standing Committee did not recommend approval at this time of the proposed new criminal rule 41.1 with respect to non-testimonial identification before and after arrest. This proposal which has been circulated to the bench and bar has *evoked a number of serious questions* which require further study and the committee believes that before a procedural rule on this subject is recommended to the Supreme Court, the committees and the Conference should have the benefit of more experience with such procedure in the states and in the District of Columbia and of *judicial consideration of the Constitutional questions involved.* The committee was further of the view that such a procedure is one with which the federal courts would have little occasion to deal except in the District of Columbia where the crimes of violence involved are, under recent reorganization, tried in the local Superior Court rather than in the United States District Court. The committee was of the view that the Superior Court could establish procedures under its own rule-making authority, thus meeting the need in the District of Columbia."

Neither the proposed new Rule 41.1 nor any similar Rule has ever been approved.

### 8.

■ That a bill was introduced in Congress to authorize District Courts by their orders to aid executive investigations, and that a Criminal Rule to achieve the same result was considered and disapproved, shows that no such authority otherwise exists. If there were such authority, as the government here contends, there would have been no need for Senator McClellan's bill or for the proposed Rule 41.1.

### 9.

■ In the case at bar, Holland had not been arrested for any federal offense. No complaint had been made before any magistrate charging Holland with any federal offense. No subpoena had issued requiring Holland to testify before a grand jury or other body. No indictment had been returned nor information filed charging him with any federal offense. There was nothing which conferred any authority on the District Court to make its July 1, 1976 order. There was no matter pending in that Court and affecting Holland over which the Court could exercise any jurisdiction. The person of Holland was not before the Court, as, for example, would be the case had he been arrested and presented for arraignment. What the District Court did in substance was to make an order in aid of an investigation by the Postal Service. Congress has not authorized any such aid, either by enacting Senator McClellan's bill or in the Postal Reorganization Act (39 U.S.C. §§ 101 and following) or elsewhere.

■ The government cites us to no specific authority for the order below. The government argues that authority existed by virtue of the Court's power "through its process to summon witnesses to give testimony and its supervisory role over grand jury investigations" (Brief of Appellee, p. 2). The conclusive answer to this argument is not in law but in the facts of the case at bar: Holland was not summoned to give testimony, no subpoena was served on him, and there was no proceeding before the Court nor ancillary proceeding (such as a grand jury investigation) in which he could give any testimony. Fed.R.Crim.P. 17(a) requires that a subpoena state "the title, if any, of the proceeding". "Implicit in this rule is the proposition that a court can issue a subpoena only if it has before it some proceeding to which the witness is being summoned". *United States v. Polizzi*, 323 F.Supp. 222, 226 (C.D.Cal.), reversed on other grounds, 450 F.2d 880 (9th Cir. 1971). There was no grand jury or other "proceeding" over which the District Court had any jurisdiction and thus no subpoena could

lawfully have been issued by that Court. See *Katz v. Briggs*, 550 F.2d 310 (5th Cir. 1977).

▮▮▮▮ Our dissenting brother finds authority for the order below in the power of the District Court to issue a search warrant upon a showing of probable cause. Leaving aside the question whether probable cause for a search warrant was in fact shown, a question by no means free from doubt, there was no intent here to ask for or to issue a search warrant. The supporting affidavit was for the purpose of securing a writ of habeas corpus ad testificandum to produce Holland before a grand jury. Moreover, the order below was not a search warrant either in form or in substance. A search warrant is not an order but is a grant of authority for a law enforcement officer to search premises for and to seize specified objects already in existence. Nothing need be done by the person who is the cause or object of the search. The order below, however, was directed solely to a subject of the investigation and ordered him to create something—namely, handwriting exemplars.

### 10.

▮▮▮▮ There are some situations where violation of a court order may be punished as a criminal contempt even though the order violated is set aside on appeal. This was recognized in *United States v. United Mine Workers*, 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884 (1947) but, as the Court there emphasized, these are situations "where . . . the subject matter of the suit, as well as the parties, was properly before the Court" and "where the elements of federal jurisdiction were clearly shown" (330 U.S. at 294, 67 S.Ct. at 696).

Chief Judge Brown for this Court made the same point in *United States v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972):

"Of course, the rule that unconstitutional court orders must nevertheless be obeyed until set aside presupposes the existence of at least three conditions: (i) the court issuing the injunction must en-

joy subject matter and personal jurisdiction over the controversy; . . . ."

In the case at bar, the District Court had no jurisdiction to make the order for handwriting samples. Accordingly, appellant cannot be punished for violating the order.

The situation here is like that in the old case of *Ex parte Fisk*, 113 U.S. 713 at 718 and 726, 5 S.Ct. 724 at 726 and 730, 28 L.Ed. 1117 (1885) where the Supreme Court said:

"When, however, a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void.

\*　\*　\*　\*　\*　\*

"The Circuit Court was, therefore, without authority to make the orders for the examination of petitioner in this case, and equally without authority to enforce these orders by process for contempt. Its order finding him for contempt and committing him to the custody of the marshal was without jurisdiction and void, and the prisoner is entitled to his release."

The judgment of conviction of criminal contempt is

REVERSED.

TJOFLAT, Circuit Judge, dissenting:

This case grows out of an investigation by the Post Office of a mail fraud scheme. Inmates of an Alabama state prison were operating, in true entrepreneurial spirit, a small business of their own during off hours. After receiving postal money orders mailed to them from accomplices not yet incarcerated, the inmates would alter the amounts and then pass the forged paper back to the outside world by means of the mails and cooperative guards.

In the course of the investigation, but before indictments had been filed or a grand jury called, postal inspectors through the United States Attorney petitioned United States District Court Judge Frank Johnson to grant them an order compelling ap-

pellant William Holland, along with other inmates, to provide a handwriting sample. The application was accompanied by an affidavit reciting that a friendly guard had admitted passing a forged money order at Holland's behest. The order was granted and served, but Holland refused to comply.

The district court, pursuant to Federal Rule of Criminal Procedure 42, then ordered Holland to show cause why he should not be held in contempt. A hearing was held, and the defendant did not deny that he had wilfully disobeyed the court order. In fact, he continued in his recalcitrance. The court found him guilty of criminal contempt and imposed a sentence of six months to begin after his present term of incarceration was completed.

The majority today has set aside Holland's contempt conviction because they

1. The appellant does not question the propriety of the criminal contempt conviction other than that it was based on an order made without jurisdiction. *See* Fed.R.Crim.P. 42. The majority agrees with appellant that there was no jurisdiction. To my mind, the quotation in the majority opinion from *United States v. United Mine Workers*, 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884 (1947), could be somewhat misleading if taken out of context. I suspect, though, that my brothers would agree that *United Mine Workers* held that

> except in circumstances of plain usurpation, a United States District Court has the authority to determine its own jurisdiction in a matter before it, and to maintain the *status quo*, as by issuance of a temporary restraining order, pending the determination of that issue. The Supreme Court concluded, therefore, that even should the district court be ultimately found, in such a case, to lack jurisdiction over the parties or the subject matter, it had power to punish violations of its prior restraining order as contempt. *United States v. Thompson*, 319 F.2d 665, 667 (2d Cir. 1963). *See also United States v. Hall*, 472 F.2d 261 (5th Cir. 1972).

I agree, however, that this case is distinguishable from *United Mine Workers* because the district court was not attempting "to preserve existing conditions pending a jurisdictional determination." *Thompson*, 319 F.2d at 667. Instead, it was commanding action by an individual, presumably believing itself to have jurisdictional power. *See Guilford Nat'l Bank v. Southern Ry.*, 297 F.2d 921 (4th Cir. 1962). It is over whether that jurisdictional power existed that my brothers and I disagree.

could not find a basis for jurisdiction for the district court's original order.[1] With this I cannot concur. Due in large part, I believe, to a miscomprehension of the importance of the fourth amendment considerations involved in this case, the majority has failed to realize that the order compelling the handwriting sample is nothing more than a type of search warrant. Since this was the case, Judge Johnson had ample authority to issue the order upon the showing of probable cause.[2]

## I

The majority relates that the "taking of handwriting exemplars does not violate . . . the Fourth Amendment protection from unreasonable searches and seizures." This is not always true.

2. Federal Rule of Criminal Procedure 41 states the general requirements for issuance of a search warrant. That rule provides in relevant part,

> (a) A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state court of record within the district wherein the property is located, upon request of a federal law enforcement officer or an attorney for the government.
>
> (b) A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; . . . or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.
>
> (c) A warrant shall issue only on an affidavit or affidavits sworn to before the federal magistrate or state judge and establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. . . . The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified. . . .

The proper analysis in a case such as this where physical evidence from a person has been sought is composed of two steps. First, the government officers must legitimately have control of the body. This is the first seizure that must pass constitutional muster. Second, the seizure of the physical evidence must be examined to determine whether it was reasonable. This dual process was recently outlined in the context of a grand jury proceeding in *United States v. Dionisio*, 410 U.S. 1, 8–9, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973):

As the Court made clear in *Schmerber [v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908], the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the "seizure" of the "person" necessary to bring him into contact with government agents, see *Davis v. Mississippi*, 394 U.S. 721, [89 S.Ct. 1394, 22 L.Ed.2d 676,] and the subsequent search for the seizure of the evidence. In *Schmerber*, we found the initial seizure of the accused justified as a lawful arrest, and the subsequent seizure of the blood sample from his body reasonable in light of the exigent circumstances. And in *Terry [v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889], we concluded that neither the initial seizure of the person, an investigatory "stop" by a policeman, nor the subsequent search, a "patdown" of his outer clothing for weapons, constituted a violation of the Fourth and Fourteenth Amendments. The constitutionality of the compulsory production of exemplars from a grand jury witness necessarily turns on the same dual inquiry—whether either the initial compulsion of the person to appear before the grand jury, or the subsequent directive to make a voice recording is an unreasonable "seizure" within the meaning of the Fourth Amendment.

This two-pronged test has been repeatedly applied by the Supreme Court. In *Dionisio* it was held that "a subpoena to appear before a grand jury is not a 'seizure' in the Fourth Amendment sense," 410 U.S. at 9, 93 S.Ct. at 769, and in *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), another grand jury case, the Court determined that a person has no reasonable expectation of privacy, and thus no protectable fourth amendment interest, in a handwriting exemplar. A different situation was presented, however, in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). In *Davis* the question before the justices was whether fingerprint evidence which had been obtained in a "dragnet" investigation following a rape had been properly admitted at trial. All conceded the great probative value and yet the slight personal intrusion the obtaining of fingerprint evidence involved.[3] Nevertheless, the evidence was stricken because the law enforcement officers had not had proper control over the body when the fingerprints were taken.[4] The Court stated,

---

**3.** *See* 394 U.S. at 727–28, 89 S.Ct. 1394; *id.* at 730, 89 S.Ct. 1394 (Stewart, J., dissenting).

**4.** The state conceded that it had had no probable cause to detain the defendant. *Id.* at 726, 89 S.Ct. 1394. The Court declined, however, to hold that probable cause was required for an investigatory detention where the purpose was only to acquire fingerprints from the detained individual. The majority opined,

Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment. It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional

sense. See *Camara v. Municipal Court*, 387 U.S. 523 [, 87 S.Ct. 1727, 18 L.Ed.2d 930] (1967). Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come

"Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Id.* at 726–27, 89 S.Ct. at 1397 (footnote omitted).[5]

Applying the above analysis to this case, I conclude that the order was eminently

proper.[6] The application presented to Judge Johnson related that an altered postal money order received through the mails had been given to a cooperative guard by inmate William Holland. This was sufficient to establish probable cause that Holland was violating federal law. It justified the seizure of his person and distinguishes this situation from that presented in *Davis*.[7]

unexpectedly or at an inconvenient time. For this same reason, the general requirement that that authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context. *Id.* at 727–28, 89 S.Ct. at 1397–1398.

The Court was not obliged to decide the question it raised, however, for the state in *Davis* made no attempt "to employ procedures which might comply with the requirements of the Fourth Amendment . . . ." *Id.* at 728, 89 S.Ct. at 1398. It was affirmatively pointed out that the detention "was not authorized by a judicial officer." *Id.*

Following the suggestion in *Davis* that less than probable cause might be permissible for detention in some circumstances, a new federal rule of criminal procedure was suggested concerning nontestimonial identification. That proposed Rule 41.1 added two things of significance to present Rule 41. First, it suggested procedures explicitly tailored to the nontestimonial identification situation. Second, it provided that, once probable cause to believe that a federal crime had been committed has been shown, a person could be made to give personal, nontestimonial evidence if reasonable grounds to suspect that he had committed the offense were present.

In my view, the only constitutional questions bothering the Judicial Conference in connection with the proposed rule revolved around the provision for detention on grounds amounting to less than probable cause. Although there is support in at least the District of Columbia Circuit for the constitutionality of the provision, *see United States v. Allen*, 133 U.S.App. D.C. 84, 408 F.2d 1287 (1969); *Adams v. United States*, 130 U.S.App.D.C. 203, 399 F.2d 574, *cert. denied*, 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969), the dicta in *Davis* is not authoritative. (It is important to note, in view of the majority's position in this case, that the lineup in *Allen* was ordered without any rule such as proposed 41.1 specifically authorizing it. The lineup in *Adams* was struck down only because of a violation of Fed.R.Crim.P. 5(a).) *See generally* McGowan, *Constitutional Interpretation and Criminal Identification*, 12 Wm. & Mary L.Rev. 235 (1970). It seems incredible that the conferees would be troubled by Rule

41.1's allowance of an order prior to the arrest of the suspect since, as will be discussed in the text *infra*, search warrants have repeatedly been issued upon a probable cause showing before any arrests or indictments have been made.

5. I attach no constitutional significance to the fact that Holland was incarcerated at the time the district court ordered him to give the handwriting exemplars. Despite his being under lock and key, he was entitled to be free from harassment and intrusions concerning offenses unrelated to his confinement.

6. I realize that in applying the test to this case I perhaps unnecessarily belabor the analysis. If Judge Johnson had the jurisdiction to enter the order, as I argue *infra*, then whether he correctly decided the appropriate fourth amendment questions is of no real significance in a contempt case. The defendant had other means of challenging the taking of the evidence, *see* Fed. R.Crim.P. 41(e) & (f), and he should have availed himself of those means and not have disobeyed a direct order of the court. *Compare Walker v. Birmingham*, 388 U.S. 307, 316 n. 6, 318, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), *with In re Green's Petition*, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962). *See generally* C. Wright, 3 Federal Practice and Procedure § 702, at 151–52 (1969), at 76–77 (Supp.1976). *See also United States v. Ryan*, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *United States v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972). In light of the cursory treatment given the fourth amendment considerations by the majority, however, I think it appropriate to flesh out the proper analysis as I see it.

7. If the seizure of the person is permissible, it must then be questioned whether the subsequent search and seizure of the evidence, in this case a handwriting sample, would be permissible. *Mara* mandates an affirmative response to that question. Handwriting exemplars do not, of course, impinge the fifth amendment right against self-incrimination. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

## II

My brothers have concluded that a district court judge has no power to sanction the seizure of non-testimonial identification evidence by government agents prior to arrest, indictment or information. It seems to me that our elder brethren on the Supreme Court would be surprised at this conclusion, especially in light of their advisory words in *Davis* that "the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context." *Id.* at 728, 89 S.Ct. at 1398.[8]

In my view, and I think clearly in the Supreme Court's view as well, handwriting samples, voice exemplars, fingerprints and the like are as much property which may be seized under a warrant as is a shotgun, marijuana, or a blood-stained shirt. At least to date, there has not been to my knowledge a successful challenge to an otherwise valid search warrant on the grounds that it was granted by the magistrate before an arrest was made, the grand jury had indicted, or a case number had been acquired from the clerk. The cases are too numerous to require citation in which warrants have been legitimately acquired for purely investigative purposes prior to arrest or formal charge.

My brethren have cast about in search of a jurisdictional base for the order to provide a handwriting exemplar. They need have looked no further than the fourth amendment itself:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.* (Emphasis added.)

Under this constitutional provision a district court has inherent judicial authority to issue a warrant and is not limited by Rule 41's technical guidelines.[9] This has been most noticeably pointed out recently in pen register cases. Application for a pen register is neither governed by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520 (1970),[10] nor specifically comprehended by Rule 41.[11] This being the case, "the permissibility of [a pen register's] use by law enforcement authorities depends entirely on compliance with the constitutional requirements of the Fourth Amendment."[12] In this context, the Second Circuit has recently held that

---

**8.** Justice Harlan in concurrence opined, "There may be circumstances, falling short of the 'dragnet' procedures employed in this case, where compelled submission to fingerprinting would not amount to a violation of the Fourth Amendment even in the absence of a warrant, and I would leave that question open." *Id.* at 728–29, 89 S.Ct. at 1398. (Harlan, J., concurring).

**9.** For text of Rule 41 see note 2 *supra.* Congress may, of course, expressly restrict the authority of the federal courts if it sees fit. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868). An article III judge is in a very different posture, of course, than a United States commissioner or magistrate, whose power is strictly controlled by congressional enactment and judicial rules. *See Kempf v. United States,* 33 F.2d 4 (1st Cir. 1929).

**10.** *United States v. Giordano,* 416 U.S. 505, 553, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part); *United States v. Clegg,* 509 F.2d 605, 610 n. 6 (5th Cir. 1975); *United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *United States v. Finn,* 502 F.2d 938 (7th Cir. 1974); *United States v. Brick,* 502 F.2d 219 (8th Cir. 1974).

**11.** As is true with handwriting exemplars, recordation of numbers dialed does not itself implicate an expectation of privacy protected by the fourth amendment. *United States v. Clegg,* 509 F.2d 605, 610 (5th Cir. 1975). Rule 41 is not explicitly directed to either personal identification procedures or pen registers. *See United States v. Illinois Bell Tel. Co.,* 531 F.2d 809 (7th Cir. 1976).

**12.** *United States v. Giordano,* 416 U.S. 505, 553–54, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part (footnote omitted)). The *Giordano* majority did not disagree with their brothers on this point. They held, however, that Title III commanded suppression of the

"the power to order pen register surveillance, whether considered a logical derivative of Rule 41 or a matter of inherent judicial authority, is the equivalent of the power to order a search warrant, and is thus subject to the requirements of the Fourth Amendment." [13]

The instant case is indistinguishable. Judge Johnson had full authority under the fourth amendment to order the relevant handwriting exemplar seized.[14] Holland's refusal to cooperate amounted to contempt, and he was properly convicted for his recalcitrance.

III

The majority today has adopted a rationale which, I submit, will not withstand analysis. In reaching the conclusion that the district court lacked jurisdiction to enter the order compelling handwriting exemplars, my brothers have held by necessity that the fourth amendment is inapplicable where the seizure of nontestimonial identification evidence is questioned. They have created an anomaly which puts tangible evidence within the Constitution's scope, but excludes evidence the acquisition of which often more seriously implicates the "right of the people to be secure in their persons." Such an exception violates both logic and precedent.[15] Moreover, it unnaturally and unnecessarily hampers those who are charged with the important duty of investigating violations of the federal laws.[16] I respectfully, but strongly, dissent.

evidence acquired from the pen registers because it was inextricably bound up with illegally monitored conversations. *See id.* at 511 n.2, 533 n.19, 94 S.Ct. 1820.

Justice Powell went on to disclose that a court order in a pen register situation is tantamount to a search warrant: "In this case the Government secured a court order, *the equivalent for this purpose of a search warrant,* for each of the two extensions of its authorization to use a pen register." *Id.* at 554, 94 S.Ct. at 1845. This common-sense approach to the problem is also fully applicable to a court's order to provide identification evidence. The order in such a case is the equivalent of a search warrant. *See Davis,* 394 U.S. at 728–29, 89 S.Ct. 1394.

**13.** *In re Order Authorizing Use of a Pen Register,* 538 F.2d 956, 960 (2d Cir. 1976). *Accord, United States v. Illinois Bell Tel. Co.,* 531 F.2d 809, 813 (7th Cir. 1976): "The common-sense approach used by the district court in issuing an order based on probable cause and following a procedure designed to comply with Fourth Amendment considerations in authorizing the use by the government of the pen register was a valid exercise of authority." *See also Ex parte Jackson,* 96 U.S. 727, 733, 735, 24 L.Ed. 877 (1878). *But see United States v. Jones,* 230 F. 262 (N.D.N.Y.1916) (dicta).

**14.** The handwriting order can also be viewed, similarly to a pen register order, as a logical extension of Rule 41. *See In re Order Authorizing Use of a Pen Register.* In *United States v. Fulcher,* 229 F.Supp. 456 (D.Md.1964), it is explained how the Espionage Act of 1917, 40 Stat. 217, 228–30 (formerly 18 U.S.C. §§ 611–25), was construed as permitting a search warrant to be issued with respect to "any felony arising under statutes of the United States."

229 F.Supp. at 457, *quoting Conyer v. United States,* 80 F.2d 292, 294 (6th Cir. 1935). Rule 41(b) was intended to take the place of this former provision of the Espionage Act. *See* Notes of Advisory Committee, Fed.R.Crim.P. 41(b). It in no way, therefore, limits a district court's power to order a search and seizure upon a proper showing of probable cause. Indeed, its intent is to allow any such permissible seizure.

In any event Rule 41 is not coextensive with the fourth amendment. It is more specific and stringent. *United States v. Haywood,* 150 U.S. App.D.C. 247, 464 F.2d 756 (1972); *United States v. Navarro,* 429 F.2d 928, 932 (5th Cir. 1970) (Simpson, J., concurring). If Rule 41 dictated the reach of the federal courts, then all cases (such as *Haywood*) which upheld searches under the Constitution despite technical violations of Rule 41 were decided incorrectly. The warrants should have been voided as outside the jurisdiction of the issuing court.

Since in my view the fourth amendment provides a jurisdictional base for the district courts to issue a warrant, the All Writs Act, 28 U.S.C. § 1651 (1970), is an additional source of power. *Cf. Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (implied cause of action found in fourth amendment for violation of individual's rights).

**15.** It is of no moment, of course, that an order to seize identification evidence requires the cooperation of the suspect, since no fourth or fifth amendment interest can be successfully asserted. *Mara; Dionisio.*

**16.** The majority has put crushing weight on the slender reed that the United States Attorney in his original application ostensibly sought a writ

This is an appeal by the Tennessee Secondary School Athletic Association of habeas corpus ad testificandum to produce Holland before a grand jury. The implied principle giving this fact relevance must be that the power of a district court is limited by the written application of the prosecutor, for the order did not purport to be a writ of habeas corpus ad testificandum, nor did it direct the prisoner to appear before the grand jury. It simply instructed Holland to provide a handwriting exemplar. A corollary of this implied principle must be that a prosecutor cannot orally suggest, and a judge cannot grant, any order more expansive than that requested in writing, despite the fact that accompanying affidavits might support the broader order. To these postulates I must demur.

But leaving this reasoning to one side, there certainly could have been no doubt about the character of the order by the time of the contempt hearing. At that point it was clear to all parties that Holland was not flaunting a purported writ of habeas corpus ad testificandum for production before a grand jury. He was simply in violation of an order to give a handwriting exemplar, which had been granted on the Government's application. At the hearing, the district judge again ordered Holland to produce the exemplar, and again he refused. As I have discussed *supra*, such an order was well within the judge's jurisdictional bounds under the fourth amendment as the equivalent to a search warrant. The adjudication of criminal contempt which followed was clearly appropriate.