**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael William CLEGG,**
**Defendant-Appellant.**

No. 74–2557.

United States Court of Appeals,
Fifth Circuit.

March 5, 1975.

Donald Gunn, Houston, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., Joe Doucette, Mary L. Sinderson, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before RIVES, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

Michael W. Clegg was convicted of thirteen counts of wirefraud violations of 18 U.S.C. § 1343. He believes that his convictions must be reversed for a number of reasons, some of which are weighty but several of which are totally without merit. The latter will be touched upon but briefly. Primary among the reasons which warrant discussion is his contention that certain evidence introduced against him at trial was obtained and used both in violation of his Fourth Amendment right to be free from unreasonable searches and seizures and in violation of 47 U.S.C. § 605.[1] Clegg argues that since the evi-

---

1. 47 U.S.C. § 605. Unauthorized publication or use of communications

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or mean-

dence was illegally obtained, it should have been suppressed and that the trial court's failure to exclude it was reversible error.

In May, 1972, Billy D. Hubbard, a Southwestern Bell security supervisor, received information from a Victor Brookshire that appellant Clegg might be using an electronic device called a "blue box" to circumvent the toll call billing system of the phone company. After a meeting with Brookshire at which Special Agent R. W. Suter of the FBI was present, Hubbard attached a TTS 176 device to Clegg's business and residence telephone lines. This device, which is capable of detecting blue box calls, monitors the line to which it is attached and produces a paper tape record of the time and date of all outgoing telephone calls, local and long distance, complete and incomplete. On the day following its installation, the TTS 176 detected illegal long distance calls emanating from Clegg's business phone. Later the machine noticed that similar calls were being placed from his residence telephone. In all, over two hundred blue box calls were discovered by the TTS 176 during the period of ap-proximately four months that it was used to keep tabs on Clegg's calls.

Once Hubbard had established that blue box calls were being placed from Clegg's telephone, he took steps to verify that the calls were being completed and to identify the illegal caller.[2] This he did by attaching a recorder, as well as the TTS 176, to Clegg's lines and recording audibly the ringing and salutations only of fifteen to twenty blue box calls. From the salutations alone the caller was identified as appellant.

Hubbard testified that during the period that the TTS 176 was monitoring Clegg's calls there was an ongoing nationwide investigation being conducted by both the FBI and Bell security investigators. The purpose of this investigation was to identify the source of the blue boxes. For it to succeed, coordination was required, and it was necessary that the arrest of all blue box users be as nearly simultaneous as possible. Thus, Hubbard kept Agent Suter, who was conducting an investigation on his own, informed of the status of the telephone company's investigation and of the fact that blue box calls were being detected. He denied that he informed

---

ing thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communica-tion (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.

2. Verification that the calls were completed was necessary in order to make a case against Clegg. This is so because a telephone company does not bill for dialing. It only charges for completed calls. Thus, in order to prove that it has been fraudulently deprived of monies due it, a telephone company must necessarily be able to show both that its billing procedures were bypassed and that completed calls were made. The identity of the person placing the illegal call is, of course, also essential.

Suter of any of his procedures *or informed him that he was making voice recordings of the salutations.* Suter provided Hubbard no advice or guidance.

Special Agent Suter testified that as a result of prior anonymous tips and the information provided by Brookshire he undertook his own investigation of Clegg. His investigation was conducted in conjunction with the FBI office in Minneapolis.[3] At a time coordinated with the Minneapolis office, search warrants for Clegg's home and office, as well as a warrant for his arrest, were obtained. When the warrants were executed on September 11, 1972, Clegg was discovered in the act of using a blue box. He was arrested, and pursuant to the search warrant the blue box and several pamphlets explaining its use were seized.

■■ Clegg's argument that the paper tapes printed by the TTS 176 and the voice recordings were obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures is bottomed on either the assumption that Investigator Hubbard was for all purposes a *de facto* agent of the FBI, or that Agent Suter participated in every aspect of Bell's investigation. If either were true, there would be governmental action involved and a serious possibility that the warrantless monitoring of Clegg's telephones with the TTS 176 *and the voice recorder* would have violated his Fourth Amendment rights. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). However, Hubbard and the FBI were conducting separate investigations. Although Hubbard kept Agent Suter informed of the status and to some degree the results of his investigation, there is no indication in the record that he acted at the behest or suggestion, with the aid, advice or encouragement, or under the direction or influence of the FBI. When

we consider all the circumstances of the case, as we are directed to do by Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), we must conclude that Hubbard was not an instrument or agent of the FBI. This is not a case. in which the FBI, by secretly (or even unintentionally but effectively) deputizing the telephone company and its investigator, attempted to avoid the restrictions against wiretapping placed upon the government by the Constitution and by statute. Rather, it is the case of a private, statutorily authorized investigation by the employee of a corporation intent upon protecting its property rights.

■ The fact that United States law enforcement authorities were informed that the investigation was underway and that it had uncovered evidence of criminal activity does not automatically change its private nature. Nor does the fact that Suter knew of the existence and nature of Hubbard's investigation necessarily make him a participant in all of it. It is only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure which the government itself, under the circumstances, could not have undertaken . that the problem discussed in United States v. Mekjian, 505 F.2d 1320 (5th Cir. 1975) arises. Preknowledge and acquiescence make a search by a private party a search by the government. Fourth Amendment standards must be complied with.[4] Any evidence which, for Fourth Amendment reasons, would have been excluded had it been gathered by the government *pro se* would, of course, have to be excluded if gathered by the only nominally private party. It would be excluded with the aim of deterring the government from further attempts to utilize knowingly the services of a private party to do for it that which it is forbidden to do for itself. However, any reason for exclusion and, as well, for attributing the search to the

---

**3.** Apparently both Bell's and the FBI's investigations were being coordinated from their respective Minneapolis offices.

**4.** In wiretap situations the strictures placed upon the government by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 would also have to be complied with.

government disappears when the activity of the private party is nothing more than activity which the government itself could legally have pursued. In such a case the government has not used a private party to circumvent anything except, perhaps, work.

In the case under consideration it is important to note that Agent Suter of the FBI had no foreknowledge that Investigator Hubbard intended to or would aurally acquire any of the *content* of Clegg's conversations. It is undisputed that all that the FBI knew was that Hubbard intended to and subsequently did successfully monitor Clegg's telephone lines with the TTS 176. As mentioned, this device, which is similar in function to a pen register,[5] notes only the existence (including the time of a call and the number dialed) of telephonic communications. It discloses nothing of the content. The Fourth Amendment, however, protects only the content of a telephone conversation and not the fact that a call was placed or that a particular number was dialed. United States v. Baxter, 492 F.2d 150, 167 (9th Cir. 1973). This is so because telephone subscribers have no reasonable expectation that records of their calls will not be made. It is, in fact, well known that such records are kept. United States v. Covello, 410 F.2d 536, 542 (2d Cir. 1969). For this reason, the acquisition by the government by means of a pen register or a TTS 176 of nothing more than information concerning the dates and times of calls placed from a particular telephone and the numbers dialed does not offend the Fourth Amendment. Korman v. United States, 486 F.2d 926 (7th Cir. 1973).[6] Thus, when Suter was informed only that Bell intended to use and later did use the TTS 176, he was told nothing which did or should have put him on notice that Hubbard was engaged in activities which, if undertaken by the government, would have violated the Fourth Amendment.[7] Specifically, Suter was not put on notice that Hubbard planned to intercept the salutations[8] of some of Clegg's conversations. This being the case, there is no reason to exclude any of the evidence gathered by Hubbard on the ground that it was obtained by means of illicit government conduct. The information concerning the number of illegal calls placed by Clegg, as well as the times and dates of these calls and the telephone numbers dialed, is admissible because, even if Hubbard's use of the TTS 176 is attributed to the government so as to make its employment "government action," there is no bar to governmental action of this type. Exclusion of the salutations is not mandated by United States v. Mekjian, *supra,* because these were acquired by private actions of which the government had no foreknowledge.

Since forbidden governmental action was absent, Fourth Amendment considerations are inapplicable to the question of the admissibility of either the TTS 176 paper tapes or the voice

---

5. For a definition and discussion of the capabilities of a pen register, see In re Joyce, 506 F.2d 373, 377, fn. 4 (5th Cir. 1975).

6. Since a pen register or, we conclude, a TTS 176, again, used alone, does not intercept communication within the meaning of 18 U.S.C. § 2510(4) governmental use of such a device is not proscribed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968. United States v. Falcone, 505 F.2d 478 (3rd Cir. 1974); United States v. Finn, 502 F.2d 938 (7th Cir. 1974); United States v. Brick, 502 F.2d 219 (8th Cir. 1974); *Korman, supra*; United States v. Lanza, 341 F.Supp. 405 (M.D.Fla.1972); United States v. Vega, 52 F.R.D. 503 (E.D.N.Y.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970); *see also* United States v. Giordano, 416 U.S. 505,

94 S.Ct. 1820, 40 L.Ed.2d 341, 374 (1974) (Justice Powell concurring in part and dissenting in part). The legislative history of the Act clearly indicates that Congress did not intend for pen register or other similar monitoring to be controlled by the provisions of Title III. *See* 1968 U.S.Code Cong. & Admin.News, p. 2178.

7. Or Title III of the Omnibus Crime Control and Safe Streets Act of 1968. See footnote 6 above.

8. The salutations were, of course, part of the aural content of Clegg's conversations. Had government action been involved in recording them, there is no doubt that both the Fourth Amendment and Title III would have been violated.

recordings. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). There remains, however, a question as to whether, because of telephone company action, either 47 U.S.C. § 605 or 18 U.S.C. § 2515 mandates their exclusion.

■ Clegg contends that the evidence of his use of the blue box was obtained in violation of 47 U.S.C. § 605 and, thus, in accordance with the line of cases interpreting that statute and Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), was inadmissible at his trial. He appears to recognize that, with respect to communication by wire, the first sentence of § 605 exempts from the prohibitions of that section those intercepts and disclosures authorized by 18 U.S.C. § 2511(2)(a)(i) and (ii) but takes the position that the exemptions are inapplicable here because the signals monitored by Hubbard were radio communications. This is so, he says, because the routes over which his illegal long distance calls traveled included microwave links. Since microwave transmission is a form of radio communication, he argues that his calls were, at least in part, radio rather than wire communications. Although ingenious, the argument is meritless. It is quite clear that the signals intercepted by the TTS 176 and the voice recorder were being transmitted over wire within the meaning of both 47 U.S.C. § 605 and 18 U.S.C. § 2511.[9] Thus, the question of whether or not the evidence acquired by Hubbard, an employee of a communication common carrier, was permissibly intercepted and disclosed to the FBI and the jury is controlled by 18 U.S.C. § 2511(2)(a)(i), not by 47 U.S.C. § 605.

18 U.S.C. § 2511(2)(a)(i) provides that: (2)(a)(i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided,* That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

This subsection, which is an amended version of its 1968 predecessor,

[P]rovides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, disclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of the rights of property of the carrier. *It is intended to reflect existing law.* (United States v. Beckley, 259 F.Supp. 567 (D.C.Ga.1965). 1968 U.S.Code Cong. & Admin.News, p. 2182. (Emphasis added.)

The reference in legislative history to *Beckley* is significant. That case, like ours, involved the question of the admissibility of certain evidence obtained by a phone company wiretap. It holds that the then current version of 47 U.S.C. § 605 [10] (old § 605) did not prohibit the

---

9. 18 U.S.C. § 2510 defines wire communication:

"As used in this chapter—
(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in pro-

viding or operating such facilities for the transmission of interstate or foreign communications; . . . ."

10. 47 U.S.C. § 605 was amended in 1968. The text of the amended or "new" version is set out in Footnote 1, *infra.* The pre-1968 or "old" version reads as follows:

§ 605. Unauthorized publication or use of communications
No person receiving or assisting in receiving, or transmitting, or assisting in

telephone company from monitoring its own lines to protect the integrity of its regular billing. It also holds that old § 605 afforded those telephonic communications which are illegal no protection from disclosure by the monitoring company. The case cites as authority both Casey v. United States, 191 F.2d 1 (9th Cir. 1951), reversed on other grounds, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952), and Sugden v. United States, 226 F.2d 281 (9th Cir. 1955), aff'd, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449 (1956). This Court, itself, like the *Beckley* court, has recognized that the Supreme Court's terse per curiam affirmance of *Sugden* indicates that old § 605 was never intended to protect the existence or content of messages illegally transmitted over communication facilities. Hanna v. United States, 404 F.2d 405 (5th Cir. 1968), cert. denied, 394 U.S. 1015, 89 S.Ct. 1625, 23 L.Ed.2d 42 (1969).

██ ██ It is unnecessary for us at this juncture to decide whether 18 U.S.C. § 2511(2)(a) continues to allow a telephone company to divulge the entire content of illegally placed telephone calls. However, we feel that it is quite clear and we do hold that § 2511(2)(a), at a minimum, authorizes a telephone company which has reasonable grounds to suspect that its billing procedures are being bypassed to monitor any phone from which it believes that illegal calls are being placed. If, by the use of a device similar to a TTS 176, it discovers the existence of illegal calls, § 2511(2)(a), again at a minimum, authorizes it to record, audibly, the salutations.[11] Additionally, § 2511(2)(a) allows a telephone company to divulge, at least, the existence of the illegal calls and the fact that they were completed (the salutations) to law enforcement authorities and ultimately to the courts, since such disclo-

transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication *and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person;* and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, con-

tents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress.

The legislative history of the 1968 amendment makes clear the congressional purpose for the modification of § 605:

This section amends section 605 of the Communications Act of 1934 (48 Stat. 1103, 47 U.S.C. sec. 605 (1958)). This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code. 1968 U.S.Code Cong. & Admin. News, p. 2196.

11. Recording of the salutations is necessary to protect the property rights of a telephone company. Completion of the call must be shown both in a prosecution for wirefraud and to entitle the company to charge the caller for the use of its long distance service. *See footnote 2. Infra.*

sures are a necessary incident to the protection of the company's property rights. As authorized disclosures, such evidence is admissible in court. 18 U.S.C. § 2517(3).

██ Our holding in this respect is nothing more than a recognition that Congress did not intend that the enactment of Title III of the Omnibus Crime Control Act of 1968 would eliminate the court-created exception to old § 605 which allowed telephone companies to conduct that limited amount of monitoring of their subscribers' telephones and to disclose those results of such monitoring reasonably necessary to protect their property rights.[12] To achieve this end, Congress amended 47 U.S.C. § 605 in 1968 and included § 2511(2)(a) in the Omnibus Crime Control and Safe Streets Act with the obvious purpose, as the legislative history indicates, of statutorily enacting this already judicially recognized exception to the language of old § 605. Our faith in the correctness of our holding is reinforced by the fact that similar results and conclusions have been reached by the district courts which have been called upon to interpret 18 U.S.C. § 2511(2)(a). United States v. Freeman, 373 F.Supp. 50 (S.D.Ind.1974); United States v. Shah, 371 F.Supp. 1170 (W.D. Pa.1974); United States v. DeLeeuw, 368 F.Supp. 426 (E.D.Wis.1974).

██ Clegg questions whether the fruits of Bell's investigation of him would have been admissible under the case law which created the protection-of-the-telephone-company-property exception to old § 605. Relying on no case in particular but probably influenced by some of the court's language in Bubis v. United States, 384 F.2d 643 (9th Cir. 1967) and Brandon v. United States, 382 F.2d 607 (10th Cir. 1967), he argues that Hubbard's whole investigation was tainted because, prior to installation of the TTS 176, the investigator did not have reasonable cause to suspect that blue box calls were in fact being placed. We accept the proposition that a telephone company must have some reason to suspect that its property rights are being abused by a particular subscriber before it begins to monitor that subscriber's phone,[13] but differ with Clegg's interpretation of what is necessary to create reasonable cause. Clegg would have us hold that the telephone company must demonstrate the same degree of Fourth Amendment probable cause that a law enforcement agency would have to show in order to obtain a search warrant before it may act—in the only way reasonably available to it, by monitoring—to protect its property rights. We decline the invitation to import the Fourth Amendment into 28 U.S.C. § 2511(a), a section of the Code which authorizes limited monitoring by *private* persons—real and corporate. Without attempting to establish comprehensive standards for determining when the phone company has reasonable cause to suspect wirefraud, we hold that under the facts of this case the telephone company acted reasonably and within the authority granted it by 18 U.S.C. § 2511(2)(a)(i) when it commenced TTS 176 operations in reliance upon the information provided by Clegg's former employee Brookshire. This is true even though Bell did not run a check into the background of Mr. Brookshire or otherwise attempt to establish his reliability.

**12.** Clegg argues mightily in his brief that use by the telephone company of the TTS 176, a device which he characterizes as superior to a pen register, was unreasonable and unnecessary. He points out that this device makes a record not only of blue box calls but also of legitimate long distance calls and local calls. It notes all calls, whether they are complete or incomplete. We are unwilling to hold that in such circumstances as these, where illegitimate calls are being made, it was incumbent on the company to install either no device or one so sophisticated—if such there be—as to select out and pass over Clegg's legitimate uses of the telephone. What the company did here was not unreasonable. And, as mentioned above, we see no viable distinction between the TTS 176 and the pen register.

**13.** That Congress intended this restriction is obvious from the language of the proviso of 18 U.S.C. § 2511(2)(a)(i).

■ Clegg next asserts that the telephone company exceeded the permissible bounds of both the judicially created exception to old § 605 and those of § 2511(2)(a) by continuing to monitor his telephone long after it had obtained enough evidence to have him indicted for wirefraud. He relies upon the Ninth Circuit's holding in *Bubis, supra,* as support for this contention. The *Bubis* court held that

. . . the monitoring and tape recording for . . . [a three month period], after ample evidence had been secured of the illegal use by appellant of the company's facilities, was unreasonable and unnecessary. *Bubis, supra,* 384 F.2d at 648.

*Bubis,* however, is not in point; for it concerned lengthy and continuous monitoring of the *contents* of the calls. It is our conclusion that, taking all circumstances into account, Bell's four-month investigation was reasonably necessary for the protection of its property rights. We stress in so holding that Hubbard's investigation was so limited that there was minimal intercept of the audible content of Clegg's telephone calls.[14]

Admittedly, it is likely that Bell could have procured the arrest, indictment and probably the conviction of Clegg on the basis of evidence which it collected during the first few days of its investigation. The conviction of Clegg for wirefraud would, of course, have had the effect of eliminating him as an abuser of the long distance lines. However, the arrest of Clegg in May would also have had the effect of possibly alerting the manufacturer and other users of the blue box to the nationwide investigations of both the telephone company and the FBI. It is not reasonable to interpret § 2511(2)(a) as demanding that Southwestern Bell should choose to protect its property right from abuse by one man and thereby destroy the possibility that

it might prevent similar abuse by scores of others. Nor would it be reasonable to read it as demanding that Bell stop monitoring an abuser as soon as it has enough evidence to procure his arrest if it decides to wait until later to report him to law enforcement authorities. On the contrary, telephone companies have a duty to note all long distance calls and to attempt to collect the tolls and taxes prescribed in their tariffs. 47 U.S.C. §§ 202, 203(c), 220; 26 U.S.C. § 4251. *See Hanna, supra,* 404 F.2d at 406–07. For the full four-month period Hubbard's monitoring of Clegg's phone was activity which was "a necessary incident . . . to the protection of the rights or property" of a communications common carrier because telephone companies have the right (in fact the duty) to bill all users of the long distance lines for all calls completed. Therefore, in accordance with the plain language of § 2511(2)(a)(i), Bell was free to disclose the results of its entire four-month investigation.[15]

■ Also included among Clegg's reasons why his conviction should be reversed are (1) that the introduction of tapes of his voice at his trial violated his Fifth Amendment right to stand mute before the jury, (2) that, in spite of the fact that he was prosecuted in a federal court by the federal government, his Fourteenth Amendment rights were violated because Texas courts would have excluded the TTS 176 paper tapes and the voice tapes, (3) that the search and arrest warrants obtained by Agent Suter were issued without probable cause, (4) that the search warrant did not describe his blue box with sufficient particularity, and (5) that there was no proof that Southwestern Bell's billing procedures were bypassed. All these points of error are meritless and are rejected.

Affirmed.

---

14. In *Bubis* the telephone company had recorded the entire content of all calls placed.

15. We note that § 2511(2)(a)(i), by its terms, contains no limitation as to time.