**Mark HADLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–85–0263–CR.**

Court of Appeals of Texas,
Amarillo.

June 29, 1987.

Rehearing Denied July 28, 1987.

Shelton & Jones, Travis D. Shelton and Dale Jones, Lubbock, Turner, Turner,

Green & Braun, Ken Turner, Oklahoma City, Okl., for appellant.

Ruth Cantrell, Asst. Dist. Atty., Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and COUNTISS, JJ.

REYNOLDS, Chief Justice.

Under a charge on the law of the parties, a jury convicted appellant Mark Hadley of murder, and assessed his punishment at confinement for sixty years in the Texas Department of Corrections. Appellant attacks the judgment with nine grounds of error.[1] The grounds are, in brief, contentions that the evidence is insufficient to support the conviction, that the trial court erred in admitting certain records and testimony, and that the court erred in its charge to the jury.[2] The grounds will be overruled, and the judgment will be affirmed.

The record compiled during the lengthy trial reveals a complex web of relationships and events that culminated in and followed the death of Monte Dean "Buddy" Reger on 28 March 1984. Because appellant's first seven grounds of error are directed to the admissibility and sufficiency of the evidence, a somewhat detailed summary of the facts is necessary.

Opal Reger owned a ranch near Woodward, Oklahoma, and controlled the finances. She and her deceased husband had three children—Virginia, Dixie, and the victim, Buddy Reger. Virginia married Tom Hadley and their son, Mark Hadley, is the appellant.

---

1. Appellant's brief was filed before 1 September 1986, the date on and after which the contentions relied upon in criminal cases in the courts of appeals are to be expressed as points of error. Tex.R.App.Proc. 74(d). To maintain uniformity with appellant's brief, his contentions will be referred to as grounds of error.

2. More specifically, appellant's numbered grounds are that (1) the evidence is insufficient as a matter of law since the only evidence supporting conviction is the uncorroborated testimony of the accomplice witness Randall Loyd Thompson; and that the trial court erred: (2) in admitting appellant's telephone records which were illegally obtained in Oklahoma, (3) in allowing the witness McCormick to identify and authenticate the telephone records, and (4) in allowing Texas Ranger Peoples to testify about evidence obtained from the telephone records; in allowing hearsay testimony from the witnesses (5) Taylor, (6) Seachris, and (7) Daniels; (8) in failing to properly charge the jury of the necessity of corroborating the testimony of the accomplice witness Thompson; and (9) in failing to properly apply the law regarding accomplice witnesses to the facts in the instructions to the jury.

According to the testimony of Randall Loyd Thompson, the accomplice in the murder for which appellant was convicted, he met appellant and eventually became his friend. Thompson wanted to become a professional rodeo clown and believed that appellant could help him. In February of 1984,[3] Thompson moved into an apartment at the Reger ranch after appellant offered him a place to stay in exchange for his labor.

While living at the ranch, Thompson saw Buddy Reger, the deceased, several times, two of which were between the middle of February and March 19, when Reger visited the ranch. Appellant told Thompson that he, appellant, and Reger had disagreements over ranch matters and, on one occasion, Thompson observed a dispute between them over a colt. Reger, appellant said, was upset about appellant's keeping his rodeo stock on the ranch, and he had to move his stock to other pastures.

Appellant told Thompson, so Thompson testified, that Reger intended to cause trouble in order to put a strain on his grandmother. Reger would mess up the books that he and Opal Reger had in order, and the auditors would be coming. If Reger could prove that Opal Reger was incompetent, he, Reger, would gain control of the ranch. In that event, Reger would sell the ranch, appellant's mother and aunt would not recover anything, and Opal Reger would not have a place to live.

In the continuation of Thompson's testimony, appellant said during the first week of March that the family and the ranch would be better off if Buddy Reger was dead. Appellant expressed the same sentiment in different words a week later. Subsequently, appellant stated that time was running out and, about a week before March 19, said that something had to be done quickly.

Thompson agreed to murder Buddy Reger to save the family ranch, to prevent Opal Reger from being evicted, and to assure that appellant's mother and aunt would get their share of the ranch. Appellant promised Thompson a permanent home and increased involvement at the ranch.

Thompson was convinced by appellant that he would only spend a couple of years in the penitentiary if he was convicted, and that he could return to the ranch upon his release. Appellant promised to help Thompson with his legal fees if he was arrested.

He could not have murdered Buddy Reger alone, Thompson said, because he did not have adequate funds, but the expense money provided by appellant gave him the ability to commit the murder. Appellant gave Thompson $1,500 to $1,700 expense money before and after the murder. At appellant's suggestion, Thompson purchased a sawed-off shotgun with the intent to use it to murder Buddy Reger.

On March 19, Thompson drove his car to Elk City, Oklahoma, and purchased a bus ticket to Amarillo, Texas. Arriving by Greyhound bus in Amarillo, he took a taxi to the Amarillo airport, where he attempted to rent a car. Because he did not have a major credit card, the car rental company refused to lease a car to him.

Then, Thompson taxied back into Amarillo and rented a motel room. He telephoned appellant and told him about the requirements of the car rental company. Later, Thompson, confirming that Budget Rent-A-Car had contacted appellant, went there and rented a dark gray or charcoal colored Firebird.

Thompson drove the car to Clarendon and picked up his friend, Kevin Bryant. Arriving in Lubbock on March 20, Thompson obtained two addresses for people listed under the name of Reger in the telephone book. He showed Bryant a small photograph of Reger he was carrying, and they located the two addresses, one of which was Buddy Reger's address. Thompson and Bryant returned to Clarendon that night.

Thompson proceeded to Lubbock the next day and stayed with Max Payne, whom he had met through rodeo friends and with whom he had previously stayed.

---

**3.** All dates hereafter mentioned are in the year 1984 unless otherwise specified.

During the next five days, he located and went inside Reger's business, a battery shop, checked out various routes through Lubbock, and attended a rodeo.

On Friday, March 23, the shotgun was stolen from the Firebird. That night, about midnight, Thompson called appellant collect from a large motel located on the south side of Lubbock near the loop. He reported to appellant that the shotgun had been stolen and that there had been no opportunity to shoot Reger.

The next day, Saturday, March 24, Thompson followed Reger to the airport, and then went to Payne's house. He told Payne that his belongings had been stolen and enlisted his help in obtaining a pistol. They went to Fred's Gun Shop, where Payne purchased a .22 caliber pistol for Thompson. Later, in a conversation with Payne, Thompson learned that some type of shot could be fired from a .38 caliber pistol which was not traceable, similar to that fired from a shotgun. About midnight of that day, Thompson called appellant collect from Motel 6, telling appellant that he did not want to use the .22 pistol to commit the murder, but wanted to use untraceable shot from a .38 caliber pistol.

Thompson drove to the Reger ranch in the Firebird on Monday, March 26. Appellant, Thompson reported, gave him $200 cash and a $300 check, which was referenced for bull fighting. Thompson cashed the check at a bank in Woodward, and purchased a .38 caliber pistol at Gill's Gun and Pawn Shop. Then, Thompson traveled to Clarendon and spent the night with Bryant.

On Tuesday, March 27, Thompson drove to Amarillo and rerented the Firebird. Driving toward Lubbock, he digressed to Palo Duro Canyon to telephone appellant from a trading post.

Arriving in Lubbock at approximately 4 p.m., Thompson went to a gas station near Reger's battery shop and obtained gas. He parked the car near the gas station, went inside, and watched Reger's business. When Reger left, Thompson followed him to his home.

Next, Thompson went to a Motel 6 near Reger's business and checked in under the name of Ronnie Thomas. Afterwards, he went to a large store, telephoned appellant, who said that it had to be done the next day because Reger was planning to come to Woodward that weekend.

On Wednesday, March 28, Thompson first drove to Reger's home and deflated a tire on his son's vehicle. He next drove to the service station near Reger's business and parked behind it. He later drove to a nearby convenience store, where he placed mud on the license plates, and then drove to Reger's battery shop, parked the car and waited.

After Reger arrived, Thompson went into the shop. He shot Reger three times with the .38 caliber pistol and killed him.

As Thompson drove away in the Firebird, he saw a man, later identified to him by appellant as Reger's son-in-law, driving to the business. Thompson went to the Motel 6 and discarded the spent cartridges.

Afterwards, he drove to Amarillo, returned the Firebird to Budget Rent-A-Car, and went to the Greyhound bus station. From there, Thompson called appellant collect. Appellant informed Thompson that "they" were looking for a man matching his appearance and the car he had been driving. Appellant instructed Thompson to call him when he arrived in Elk City.

Thompson rode the bus to Elk City, from whence he drove his car to Hammon. He called appellant collect. Afterwards, he drove to a friend's house and stayed there.

The next day, Thursday, March 29, Thompson called appellant and they arranged to meet at the land appellant leased. At that meeting, Thompson gave appellant the .38 caliber pistol and the unused shells. Appellant told him that he had to stay away from the ranch because people would be coming and asking questions. Appellant also gave Thompson $200 in cash, suggested that he shave his mustache, and told him that he, appellant, would contact his friends Joe Chick and George Taylor to make arrangements for him to stay with them over the next several days.

Following appellant's instructions, Thompson drove to Chick's house and spent the night. On Saturday morning, March 31, he drove to Cleburne, where he met Taylor.

Still following appellant's instructions, Thompson told Taylor about the murder, albeit he did not really say anything about appellant's involvement. Taylor was shocked and upset at both Thompson and appellant. After a few days, Taylor gave Thompson $1,000 cash and told him that he had received it from appellant.

Thompson drove to Austin, attended a rodeo, and called appellant several times. Several days later, Thompson returned to Taylor's place and gave him the .22 caliber pistol, because he planned to fly from the Dallas-Fort Worth airport to Oklahoma City and did not believe he could get the weapon through airport security. Thompson flew to Oklahoma City.

Two friends met Thompson at the airport and drove him to Woodward, where he stayed several days. From there, he moved in with Jessie Brown, Janet Brown, and Predetta Seachris, the latter being a fellow employee when Thompson worked at United Food Distributors. Thompson lived with these friends, sharing expenses, until he surrendered to authorities on May 5.

Jan Paxton, a desk clerk at the Travelodge in Amarillo, verified Thompson's stay at the motel. Thompson registered at the motel on March 20, and checked out the next day, March 21.

Lisa Curry, an employee of Budget Rent-A-Car in Amarillo, confirmed that Thompson did not have a credit card when he attempted to rent a car. Leslie Norris, another Budget Rent-A-Car employee, testified that she had written the name of the motel, the Travelodge, where Thompson was staying and a telephone number. She dialed the telephone number, talked with someone who identified himself as appellant, and verified that Thompson worked there. She instructed Curry, who substantiated the telephone call, to rent the car to Thompson for cash. Curry rented the Firebird to Thompson on March 21, and re-rented it to him on March 28, with the name

"Mark Hadley Rodeo" being written on the lease form. Records related to these transactions were admitted into evidence, and appellant's name, address, and telephone number appear thereon, with the name Kevin Bryant in the town of Clarendon shown as a contact.

Kevin Bryant acknowledged that he traveled with Thompson to Lubbock in March in the dark gray or black Firebird Thompson was driving. Bryant identified a photograph of the deceased's house as one of the two residences they located on the trip. Examining a photograph of the deceased, he stated it appeared to be the same man in the photograph shown to him by Thompson, who was looking for the man. Thompson told him, Bryant said, that he would not approve of his plans and that he might have to go to the pen for a couple of years.

Max Payne, who had met Thompson earlier, testified that Thompson, driving a charcoal gray Firebird, came to his home on March 22. Thompson left on the morning of March 23 and returned the following Saturday morning.

At that time, Thompson told Payne that someone had stolen his clothing and a sawed-off shotgun, and that he needed to call his employer, Mark Hadley. Thompson requested Payne to help him obtain a gun since he was traveling a lot. Payne purchased for Thompson a .22 pistol, the purchase record of which was introduced into evidence.

In their discussion of tracing a bullet to a particular gun, Payne told Thompson that shotgun pellets could not be traced. Payne eventually showed Thompson snakeshot or ratshot that he used in his .38 caliber handgun, and said that snakeshot was like having a shotgun in a pistol.

After the murder of Reger, caused by his being shot with multiple pellets, Payne saw the composite drawing of the suspect in the paper and became somewhat suspicious. Several days later, he gave his information to police officers.

James Gill, a businessman in Woodward, verified that on March 26, he sold Thompson a .38 Titan Tiger Special handgun, a

box of .38 special shot or bird shot shells, and regular .38 blunt nose bullets. A record of the sale was introduced into evidence.

Jack Hart, who had been employed at a service station near the deceased's place of business, gave testimony that a man driving a new Firebird came into the station, and stayed two or three hours before the murder. Hart later identified a photograph of Thompson as a photograph of the man. He saw the same car and man near the station just before the murder.

Mary Clark, an employee of West Texas Bags, a business next door to the deceased's business, said she saw a man in a car near the business. She became suspicious, and went inside to get a pencil to record the license number. While inside, she heard three gun shots, then saw the man get into the car and drive away. She conveyed her observations to the deceased's son-in-law, who arrived as Thompson was leaving the scene, and who opted to attend the deceased rather than to pursue Thompson.

Bill Daniels, chief of police at Texas Tech University, testified that he was acquainted with the deceased and heard about the shooting on his radio. He called his brother, police officer Teddy Daniels, and informed him that the deceased had told him he did have problems with a nephew who ran the Woodward ranch.

Undersheriff Jim Arnold of Woodward recounted that he was contacted by Lubbock police on the day Reger was murdered. As a result, Arnold drove to the Reger ranch that morning, talked with appellant, and learned that he already knew about the murder. To Arnold, appellant seemed concerned and answered all of his questions.

Joe Chick, a blacksmith and admitted friend of appellant, acknowledged that Thompson, who did not have a mustache, came to his home and spent the night, and planned to go visit George Taylor. Chick denied that he had received a telephone call from appellant in regard to Thompson's visit.

Cleburne resident George Taylor, who was a race horse trainer and also trained people to be rodeo clowns, said that Thompson came to his place in the spring of 1984. Shortly before Thompson arrived, appellant, who had called Taylor some two months before about sending a friend to a rodeo clown school, called, saying he wanted to send Thompson to his place.

While he was at Taylor's ranch about five miles from Cleburne, Thompson, who said he had been at Joe Chick's place, told Taylor that he had shot the deceased with ratshot or bird shot, and that appellant had got him to do it. When asked what appellant gave him for doing this, Thompson replied that appellant said he would take care of Thompson's little girl for the rest of her life, adding, in Taylor's words, "[t]hat was his pay-off."

Shortly thereafter, Taylor, who wanted Thompson to leave his place, telephoned appellant, saying he could not keep Thompson, who was broke and needed money. Appellant said he would try to get some money. They agreed to meet in Sayre, Oklahoma, where Taylor was going to get a horse, the next day. When they met, appellant gave Taylor $1,000 in cash.

Upon returning to his ranch, Taylor gave the money to Thompson, who went to a rodeo in Austin. Thompson returned, arranged a flight from the Dallas-Fort Worth airport, gave Taylor a .22 pistol, and left. Several months later, Taylor delivered the pistol to a Texas Ranger.

It was the testimony of Predetta Seachris, who had worked with Thompson for a home food distributor, that on March 10 they had returned late from an appointment. Thompson told her that he did not want to return to the Reger ranch because appellant and Buddy Reger were having problems.

When officers came to her house on May 5, she learned that Thompson was wanted for Reger's murder. A short time afterwards, Thompson arrived and said he believed the officers wanted him for the murder, and later surrendered.

At Thompson's request, Seachris called appellant, told him that Thompson had

been arrested, and said he needed appellant's help. She called again, and appellant agreed to meet her at a bowling alley parking lot near the edge of Enid.

When they met, Seachris entered appellant's vehicle, which he drove around the side of the bowling alley where there was less traffic. Appellant was nervous, kept looking to see if they were being watched, and said he did not want anyone to know of the meeting.

Appellant was curious about what Thompson had told her and the details of his arrest. Agreeing to help with Thompson's legal expenses, appellant instructed her to find out how much money Thompson's attorney needed, to call him collect saying a friend was calling, and to tell him the amount needed for legal fees by saying that it was the amount required for the purchase of a horse. Fearful that his telephone might be bugged, appellant told her that no one was to find out that he was helping with Thompson's legal fees.

Upon questioning by Seachris why Thompson was in Texas, appellant said he sent him down there. When asked what that meant, appellant said he sent Thompson to keep an eye on Reger, who he thought needed to be watched, and that he had rented a car for Thompson.

The next day, Seachris called appellant collect and told him that $5,000 was needed to buy the horse, which was the amount of the legal retainer fee. Appellant said it would take him a couple of days to get the money, and he asked her to call back.

When Seachris called collect again and asked about the money, appellant replied that he would probably have the money the next day. Appellant did not produce the money and, although Seachris attempted to call appellant, she was unable to contact him.

The telephone records of appellant, Jessie Brown, and Payne, together with records of telephone calls made from pay telephone stations, were admitted into evidence. The records and accompanying testimony, particularly that of Texas Ranger Jackie Peoples, showed that between the time Thompson rented the car through the day of the murder, appellant received collect calls from the Payne residence, a Motel 6 and a Target store in Lubbock, a pay phone in Clarendon, the Goodnight Trading Post in Palo Duro Canyon, the Greyhound bus station in Amarillo, and a coin operated phone in Hammon. The calls were from places from which, Thompson testified, he called appellant collect and, in some instances, other witnesses placed Thompson at the places about the times the calls were made. It was revealed in the records that a direct call was made to appellant's number while Thompson was staying at Payne's home. Appellant's records also showed that calls were made to the residences of Chick and Taylor the day following the murder. The records supported Seachris' testimony about her collect calls to appellant after Thompson's arrest.

To accord progressive attention to appellant's grounds of error, consideration will be given initially to the objections to the admission of evidence, next to the challenge to the sufficiency of the evidence, and then to the attacks on the court's jury charge. Of the initial consideration, the first concern will be the objections to the admission of appellant's telephone records and the testimony related thereto.

Ricky Cunningham, an investigator for the Woodward District Attorney, testified that in May, the Lubbock County Criminal District Attorney's office requested assistance in obtaining telephone records concerning appellant. A petition prepared in the nature of a civil proceeding and an executed affidavit were presented to a Woodward associate district judge. The judge ordered that Cunningham be allowed to examine and copy the records of the telephone company pertaining to appellant's phone bills for the months of February through May, 1984 for the limited purpose of the investigation of the death of Reger. A subpoena issued on the judge's order and Cunningham obtained the records, which were furnished to the Lubbock County Criminal District Attorney's office. The proceeding was instituted and conducted, and the records were obtained, without any notice to appellant. Cunning-

ham admitted that he was not aware whether there is or is not an Oklahoma statute authorizing the ex parte proceeding.

Approximately a year later in June of 1985, the Lubbock County Criminal District Attorney's office, following statutory procedure, secured a subpoena for the appearance of Ruth McCormick, an employee of the Oklahoma telephone company, with the same records. Tex.Code Crim.Proc.Ann. art. 24.28 (Vernon 1966; Vernon Pamp. Supp.1987). The testimony of McCormick and the records were received during appellant's trial over the primary objection of the lack of a predicate. The predicate was absent, so the objection was voiced, because there was no showing of any statutory authority for the issuance of the May, 1984 subpoena in Oklahoma, thereby resulting in the seizure of the telephone records in violation of appellant's Fourth Amendment and other constitutional rights wherein he enjoys a right of privacy, which infected the production of the records by the June, 1985 statutory action of the Lubbock County Criminal District Attorney's office.

The admission of the telephone company's records pertaining to appellant, the identification and authentication of them by McCormick, and the testimony of Ranger Peoples based thereon, are the subjects, respectively, of appellant's grounds of error two, three, and four. Thereunder, appellant submits that the validity of the original search through which the records were obtained must either stand or fall under the requirements of Oklahoma statutes and constitutional provisions. He then argues, in brief, that he has a protected right of privacy in his telephone statements, particularly guaranteed by the Oklahoma Constitution, which was invaded without due process in violation of Oklahoma statutes, thereby sufficiently tainting the Texas prosecutor's acquisition of the records so as to render them illegal evidence within the meaning of the Fourth Amendment to the United States Constitution.

■ In submitting that the validity of obtaining the telephone records is deter-

mined under Oklahoma law, appellant tacitly recognizes that since the Fourth Amendment does not provide a general constitutional right to privacy, the protection of the right is left largely to the law of the individual states. *Katz v. United States*, 389 U.S. 347, 350–51, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although relying on a cited provision of the Oklahoma Constitution, the language of which is not disclosed, as affording a right to privacy, and on two quoted Oklahoma statutes as providing the only two occasions when the district attorney may issue subpoenas, neither of which addresses the action taken in the Oklahoma court, appellant neither offered proof of Oklahoma law in the trial court nor requested the trial court to take judicial notice of it. Absent the trial court's opportunity to examine the necessary source material on which appellant relies, this Court will not take judicial notice of Oklahoma law. *Plaster v. State*, 567 S.W.2d 500, 502 (Tex.Cr.App.1978); *Sparkman v. State*, 519 S.W.2d 852, 855 (Tex.1975).

Moreover, appellant has not cited any authority condemning under Oklahoma law either the obtaining of the telephone records by the method employed or testimony concerning such records. In the absence thereof, the remaining inquiry is whether the telephone records were obtained in violation of appellant's Fourth Amendment rights.

■ It is to be accepted that the Fourth Amendment, which only protects a person's "constitutionally justifiable expectations of privacy," *United States v. White*, 401 U.S. 745, 751, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), protects the content of a telephone conversation, but not the fact that a call was placed or that a particular number was dialed. The lack of protection for the records of telephone calls obtains because telephone subscribers have no reasonable expectation that records of their calls will not be made; indeed, it is well known that such records are kept. *United States v. Clegg*, 509 F.2d 605, 610 (5th Cir.1975).

■ Then, the acquisition by the Woodward District Attorney's office, through judicial proceedings, of nothing more than

information concerning the dates and times of calls from and to a particular telephone does not offend the Fourth Amendment. As a result, there is no reason to exclude the records or the testimony concerning them on appellant's objection that the records were obtained by means of illicit official conduct. *Id.* Grounds of error two, three, and four are overruled.

By his fifth and sixth grounds, appellant contends that the court erred in allowing, over his objections, certain testimony of, respectively, George Taylor and Predetta Seachris which did not come within any exception to the hearsay rule. The objectionable testimony by Taylor was Thompson's admission to him of the killing and implication of appellant made after the murder. The offending testimony of Seachris was Thompson's statement made to her before the murder that Buddy Reger and appellant were having "differences."

The testimony of Thompson's statements, made out of court in appellant's absence and offered to prove the truth of the statements, was hearsay. Being objected to, the testimony was inadmissible unless it was correctly admitted under an exception to the hearsay rule. *Sewell v. State*, 629 S.W.2d 42, 45 (Tex.Cr.App.1982).

■ An exception to the hearsay rule is the co-conspirator exception, which is a rule of evidence not limited to prosecutions for conspiracy, but applicable to any offense participated in by co-conspirators. *Roy v. State*, 608 S.W.2d 645, 651 (Tex.Cr.App. 1980). In this regard, the existence of a conspiracy may be shown by direct or circumstantial evidence and may be inferred from the evidence. *Grant v. State*, 140 Tex.Cr.R. 46, 143 S.W.2d 383, 384 (1940). Under the exception, each act or statement of a co-conspirator up until the time the object of the conspiracy is completed is admissible, *Helms v. State*, 493 S.W.2d 227, 230 (Tex.Cr.App.1973), even though it occurred out of the presence and hearing of the accused. *Saddler v. State*, 167 Tex. Cr.R. 309, 320 S.W.2d 146, 149 (1959).

■ Then, in order for the hearsay testimony of Thompson's statements to be admissible, the State was required to show that, at the times Thompson made the statements, he was participating in a conspiracy with appellant and that the statements were made during the conspiracy. *Ward v. State*, 657 S.W.2d 133, 136–37 (Tex.Cr.App.1983). In this connection, a conspiracy includes everything within the contemplation of the conspirators, and a conspiracy is not terminated until every act subsequent to the commission of the offense within the plan and scope of the conspiracy has been completed. *Baugh v. State*, 135 Tex.Cr.R. 590, 122 S.W.2d 297, 299 (1938).

■ In this prosecution, the evidence of the events occurring before and after Thompson made the statement to Seachris and before he made the statements to Taylor sufficiently demonstrated a conspiracy between Thompson and appellant to murder Reger. Although the murder had not been committed when Thompson informed Seachris that Reger and appellant were having difficulties, her testimony of his statement was admissible as the declaration of a co-conspirator tending to shed light upon the motive for which the murder was committed. *Drakes v. State*, 505 S.W.2d 892, 894 (Tex.Cr.App.1974); *Young v. State*, 150 Tex.Cr.R. 378, 201 S.W.2d 46, 50 (1947). Moreover, the previous admission of the same testimonial fact without objection precludes reversible error. *Boles v. State*, 598 S.W.2d 274, 279–80 (Tex.Cr. App.1980).

■ At the time Thompson made the statements to Taylor, he had been sent to Taylor by appellant to escape detection for the murder that had been committed, he still possessed the .22 caliber pistol he had contemplated using to commit the murder, and he was following appellant's specific instructions to make the statements to Taylor. In these circumstances, the trial court was justified in admitting Taylor's testimony of Thompson's statements as the declarations made by a co-conspirator during the furtherance, and before the termination, of the conspiracy. *Helms v. State, supra*, 493 S.W.2d at 230. Grounds of error five and six are overruled.

In a like manner with his seventh point, appellant contends that Bill Daniels' testimony that he told his brother, police officer Teddy Daniels, that Reger "said he did have some problems with a nephew who run the ranch up at Woodward, Oklahoma," was inadmissible hearsay. The contention is correct, necessitating a rejection, on the authority cited, of the State's presentment that the testimony came within the state of mind exception to the hearsay rule, *see Jones v. State*, 515 S.W.2d 126, 129 (Tex.Cr.App.1974), or was admissible under section 19.06 of the Texas Penal Code Annotated (Vernon 1974) to show the previous relationship existing between appellant and the deceased. *See Love v. State*, 581 S.W.2d 679, 681 (Tex.Cr.App. 1979). However, the error in admitting the testimony was rendered harmless by the unobjected-to admission of other evidence, set out in the summarized testimonial facts, of substantially the same fact. *Nicholas v. State*, 502 S.W.2d 169, 174 (Tex.Cr.App.1973). The seventh ground of error is overruled.

With the overruling of appellant's challenges to the admission of evidence, attention is now given to his initial contention that the evidence is insufficient to support the conviction. The premise for the contention is that the evidence of the accomplice Thompson was not corroborated, thereby rendering the evidence insufficient as a matter of law.

It is, of course, elemental that a conviction cannot be had upon the uncorroborated testimony of an accomplice; hence, the accomplice's testimony must be corroborated with other evidence tending to connect the defendant with the offense committed, and the corroborating evidence must show more than the commission of the offense. Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 1979). The applicable test to determine the sufficiency of the corroboration is to eliminate from consideration the accomplice's testimony to ascertain if there is inculpatory evidence which tends to connect the defendant with the commission of the offense. *Cruz v. State*, 690 S.W.2d 246, 250 (Tex.Cr.App.1985). The test, however, does not require that the corroboration directly link the defendant with the crime or that it be sufficient in itself to establish guilt, *Richardson v. State*, 700 S.W.2d 591, 594 (Tex.Cr.App.1985); it need only make the accomplice's testimony more likely than not. *Eckert v. State*, 623 S.W.2d 359, 361 (Tex.Cr.App.1981). Then, if there is other evidence which tends to connect the defendant with the commission of the offense, the corroboration is sufficient; otherwise, it is not. *Passmore v. State*, 617 S.W.2d 682, 684 (Tex.Cr.App. 1981).

Appellant selects and comments on a part of the non-accomplice evidence—*viz*, that his telephone records show only calls and not conversations or the parties to them, that the $300 check he made to Thompson is consistent with his business relationship with Thompson, that he merely confirmed Thompson's employment to the car rental company, and that his $1,000 payment to Taylor is compatible with his previous discussion of Thompson's taking Taylor's rodeo clown school—to argue that this evidence is at least as consistent with legitimate activity as it is incriminating. Therefore, he concludes, the evidence cannot be used to corroborate Thompson's testimony. However, the evidence, considered in context, is not susceptible to such a narrow view.

The evidence other than Thompson's testimony establishes problems between appellant and the deceased, and that appellant told Seachris he had sent Thompson, for whom he had rented a car, to Texas to watch the deceased. Upon his arrival in Texas, Thompson possessed a photograph of Buddy Reger, indicating it was furnished by a member of the Reger family. Appellant's telephone records show a series of calls received and accepted on his telephone, both before and after the murder, from various locations where witnesses placed Thompson at the approximate times of the calls. The car rented to Thompson, after the car rental company verified Thompson's employment with appellant, was the same car witnesses placed at the scene of the murder and driven by the

murderer, whose description matched Thompson's.

Appellant's telephone records also disclosed calls from his telephone to the Chick and Taylor residences prior to Thompson's arrival at those places. When Taylor informed appellant that he could not keep Thompson, who needed money, appellant, without suggestion as to the amount, provided $1,000 in cash, more than the $750 cost of Taylor's rodeo clown school, for Thompson. Thereafter, appellant, meeting surreptitiously with Seachris and expressing fear that his telephone was bugged, agreed to help, upon information to be furnished by Seachris in a cryptic phone message, with the legal expenses of Thompson, who had just been arrested for the murder of his, appellant's, uncle.

▮ The cumulative effect of all the evidence independent of Thompson's testimony tends to connect appellant with the commission of the crime by soliciting, encouraging, directing, aiding, or attempting to aid Thompson to murder Reger. It is, therefore, sufficient to corroborate the testimony of the accomplice Thompson and to make his testimony, which was consistent with the corroboration, more likely than not. It follows that the evidence passes the standard of review that any rational trier of fact, after reviewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., Houston v. State,* 663 S.W.2d 455, 456 (Tex.Cr.App.1984). Appellant's first ground of error is overruled.

In its charge to the jury, the court included, in paragraph 4, the standard definition of the legal term "accomplice," and then, in compliance with article 38.14, Texas Code of Criminal Procedure Annotated (Vernon 1979), instructed that:

The witness, Randall Loyd Thompson, is an accomplice, if an offense was committed, and you cannot convict the defendant upon his testimony unless you first believe that his testimony is true and shows that the defendant is guilty as charged, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside of the evidence of the said Randall Loyd Thompson tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

In paragraph 5 immediately following the instruction, the court charged the jury in this language:

Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that Randall Loyd Thompson, in Lubbock County, Texas, on or about the 28th day of March, 1984, did intentionally and knowingly cause the death of an individual, Monte Dean Reger, by shooting the said Monte Dean Reger with a handgun, and that the defendant, MARK HADLEY, knew of the intent, if any, of the said Randall Loyd Thompson to shoot the said Monte Dean Reger, and acted with intent to promote or assist the commission of the offense by Randall Loyd Thompson by soliciting, encouraging, directing, aiding, or attempting to aid Randall Loyd Thompson to commit the offense of shooting Monte Dean Reger, then you will find the defendant, MARK HADLEY, guilty of murder as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

Appellant unsuccessfully objected to paragraph 4 of the charge "because the court did not inform the jury that the accomplice Thompson could not be convicted on his own confession alone, and that the jury must first find that there was other evidence corroborating the confession before they could find Thompson guilty in the first step toward considering" appellant's guilt.

**534**

The objection has been brought forward as appellant's eighth ground of error. Its appellate premise is the principle, reiterated in *Smith v. State*, 363 S.W.2d 277, 279 (Tex.Cr.App.1963), and quoted in *Brown v. State*, 576 S.W.2d 36, 42 (Tex.Cr. App.1979), "that a confession, alone, is not sufficient to support a conviction. It must be corroborated." The principle is a sound one, but it is inappropriate as the basis of the objection and ground of error.

■ The principle expresses, as *Smith* and *Brown* illustrate, that proof of the fact that the crime charged was committed by someone must be evidenced other than by the confession of the defendant charged with the crime. But in this prosecution, the confessing accomplice Thompson was not being prosecuted for the crime, and the question presented is not whether the accomplice's testimonial confession of the murder was corroborated, but whether the court's charge had to expressly require the jury to find corroboration of his confession to the murder. It did not.

The negative answer to appellant's contention is furnished by the comprehensive analysis of the requirements for the charge on an accomplice witness made in *Holladay v. State*, 709 S.W.2d 194 (Tex.Cr.App.1986). After a full review of the matter of corroboration, the *Holladay* court held that the instruction given there on the accomplice's testimony, which mirrors the paragraph 4 instruction quoted above in this prosecution, satisfied the requirements of article 38.14, *supra*, and sufficiently protected the rights of appellant as guaranteed by law so that the charge was not subject to a claim of error for not expressly requiring corroboration of the accomplice's testimony of the crime. *Holladay v. State, supra*, at 199. The eighth ground of error is overruled.

Akin to the eighth ground is appellant's ninth, and last, ground of error by which he contends the court failed to properly apply the laws regarding accomplice witnesses to the facts of the case. The ground is bottomed on appellant's trial court objection that paragraph 5 of the court's charge "should again charge the jury" that accomplice Thompson's testimony must be corroborated. The contention is not well founded.

In speaking to the corroboration required for the accomplice's testimony, the *Holladay* court, pointing out a distinction between confirmation as to the circumstances of the offense and confirmation of the defendant's connection to the offense, explained that any particular statement made by the accomplice need not be corroborated since the corroboration required by law is evidence tending to connect the accused with the commission of the offense. Specifically, the court said:

> In sum, where the State relies upon an accomplice witness' testimony to convict the accused for a particular offense, the accomplice witness' testimony must be both material and must be corroborated by independent evidence tending to connect the accused with that offense.

709 S.W.2d at 200. This is the only rule for the corroboration of the testimony of an accomplice witness. *Anderson v. State*, 717 S.W.2d 622, 631 (Tex.Cr.App.1986).

Thus, when the charge is read as a whole, as it must be, the instruction in paragraph 4 more than adequately protected appellant's rights to corroboration. *Holladay v. State, supra*, at 199. As a result, the court did not err in refusing to charge in paragraph 5 that Thompson's testimony must be corroborated. The ninth ground is overruled.

The judgment is affirmed.